United States District Court
Southern District of Texas
**ENTERED**
August 12, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANADARKO E&P ONSHORE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civ. A. H-14-3168 |
| | § | |
| MARY MARSHALL SMITH TRUST UNDER | § | |
| WILL DATED OCTOBER 24, 1977, | § | |
| FBO KATHARINE M. MARSHALL, | § | |
| WELLS FARGO BANK, N.A., | § | |
| TRUSTEE; MARY MARSHALL SMITH | § | |
| TRUST UNDER WILL DATED OCTOBER | § | |
| 24, 1977, FBO MARGARET MURDOCH, | § | |
| WELLS FARGO BANK, N.A., | § | |
| TRUSTEE; MARY MARSHALL SMITH | § | |
| TRUST UNDER WILL DATED OCTOBER | § | |
| 24, 1977, WELLS FARGO BANK, | § | |
| N.A., TRUSTEE; PETE AND SALLY | § | |
| SMITH FOUNDATION; and MICHIGAN | § | |
| 4-H FOUNDATION, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER OF DISMISSAL**

Pending before the Court in the above referenced cause, alleging breach of contract, money had and received, and fraudulent transfer under Texas Uniform Fraudulent Transfer Act ("TUFTA" or "UFTA"), Texas Business & Commerce Code §§ 24.005 and 24.006(a), or, alternatively, under South Carolina Code Ann. § 27-23-10,[1] and seeking to recover mistaken payments of mineral royalties to the Trust Defendants[2] and organizations, is Defendant

---

[1] Anadarko asserts all four claims against Michigan 4-H, among other Defendants.

[2] The "Trust Defendants" are the Mary Marshall Smith Trust Under Will Dated October 24, 1977, FBO Katherine M. Marshall, Wells Fargo Bank, N.A., Trustee, and the Mary Marshall Smith Trust Under Will Dated October 24, 1977, FBO Margaret

-1-

Michigan 4-H Foundation's ("Michigan 4-H's") amended motion to dismiss all claims against it in Plaintiff Anadarko E&P Onshore's ("Anadarko's") Second Amended Complaint[3] for lack of personal jurisdiction[4] under Federal Rule of Civil Procedure 12(b)(2), and, alternatively, dismissal of the breach of contract cause of action for failure to state a claim upon which relief can be granted under Fed. R. of Civ. P. 12(b)(6)(instrument #30).

Michigan 4-H, a Michigan charity with its principal place of business in Michigan (Affidavit of Cheryl Howell ("Howell"), Executive Director of Michigan 4-H, #30, Ex. A, ¶ 3), states that Anadarko concedes that it made the mistaken payments to the Trust Defendants, but not to Michigan 4-H.  It further maintains that its only connection to the payments, if any, is that it participated in a South Carolina litigation with two South Carolina entities, in which the Trust Defendants paid Michigan 4-H $2.25 million in cash and a 33.33252 percent portion of a royalty interest in mineral leases[5] in Dimmit County, Texas as part of the settlement of the case.  Michigan 4-H contends that it is not subject to specific or general personal jurisdiction in Texas.

_____

Murdoch, Wells Fargo Bank, N.A.

[3] Instrument #25.

[4] Anadarko does not claim that general personal jurisdiction exists here.

[5] "Under Texas law, an interest in an oil and gas lease is an interest in the minerals in the ground," and therefore is real property. *In re Jones*, 77 B.R. 541, 544-45 (Bankr. N.D. Tex. 1987), *citing Phillips Petroleum Co. v. Adams*, 513 F.2d 355, 363 (5th Cir. 1975)("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production."), *cert. denied*, 423 U.S. 930 (1975).

While it admits that, as a result of the South Carolina settlement agreement, it now owns a fractional share of a Texas mineral interest, its only contact with Texas, Michigan 4-H did not receive that interest until after Anadarko made the mistaken payments to the Trust Defendants.  Michigan 4-H further states that Anadarko's new allegation that Michigan 4-H hired Texas legal counsel to evaluate the mineral interests before the settlement of the South Carolina case is not true.  Ex. A, Howell Affidavit at ¶ 16.

Moreover, for the first time, in its Second Amended Complaint, Anadarko now conclusorily asserts that Michigan 4-H in some way "adopted" the Trust Defendants' division orders[6] with

---

[6] *Black's Law Dictionary* (6th ed. 1990) defines a division order as "[a] direction and authorization to purchaser of oil to distribute purchase price in specified manner; its purpose is to assure that purchaser pays only those parties who are entitled to payment."  In *Louisiana Land and Exploration Co. v. Pennzoil Exploration and Production Co.*, 962 F. Supp. 908, 913 (E.D. La. 1997), the district court defined the term as "essentially a contract that confirms the division of interest among all the parties who own the product obtained from a well and establishes the proportions in which each party is entitled to share proceeds from a well."  In Texas, "a division order constitutes a contract between the interest owners and the pipeline purchasers." *Bankers Life Ins. Co. of Neb. v. Scurlock Oil Co.*, 447 F. 2d 997, 1002 (5th Cir. 1971), The panel continued, *id.* at 1003,

> [T]he division order under which a pipeline purchaser buys oil is a singularly significant instrument in the pipeline purchasing business.  It is uncontradicted that when a pipeline purchaser pumps oil from a Tank to which a particular division order number is assigned, the pipeline purchaser has no way of knowing (other than to rely on the division order) where that oil came from.  Thus, if the oil is pumped from a particular tank to which a particular division order number has been assigned, that

Anadarko, and that the breach of contract claim against Michigan 4-H "arises out of" Anadarko's division orders with the Trust Defendants.    Michigan 4-H objects that the record clearly demonstrates that there was no such contract between Anadarko and Michigan 4-H and that the terms of the division orders do not apply to Michigan 4-H because it never availed itself of anything in Texas that relates to Anadarko's claimed prior mistaken payments to the Trust Defendants.

If the Court does not dismiss the claims for lack of personal jurisdiction, alternatively Michigan 4-H urges the Court to dismiss the breach of contract claim against Michigan 4-H for failure to state a claim.

**Standards of Review**

**Fed. R. Civ. P. 12(b)(2)**

When a defendant files a motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the defendant. *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006), *citing Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982).   "Absent any dispute as to the relevant facts, the issue of whether personal jurisdiction may be exercised over a nonresident defendant is a question of law . . .

---

fact, and that fact alone, signifies that payment must be made in accordance with the particular division order.   The pipeline purchaser must therefore rely on the operator to run the right oil into the right tank, and on its own gauger to enter the correct division order number on the run tickets.

." *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 418 (5th Cir. 1993).  Where the facts are disputed, the party seeking to invoke the court's jurisdiction bears the burden of establishing sufficient contacts with the forum state by the nonresident defendant to invoke the court's jurisdiction. *Bullion v. Gillespie*, 895 F.2d 213, 216-17 (5th Cir. 1990).

At the pretrial stage of litigation, if the district court does not conduct a hearing on personal jurisdiction, the plaintiff need only present a prima facie case of personal jurisdiction. *Wilson v. Belin*, 20 F.3d 644, 648 (5th Cir.), *cert. denied*, 513 U.S. 930 (1994); *Felch v. Transportes Lar-Mex S.A. DE CV,* 92 F.3d 320, 325 (5th Cir. 1996); *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  Proof by preponderance of the evidence is not required. *Johnston*, 523 F.3d at 609.[7]  When a defendant disputes factual bases for personal

---

[7] As the Fifth Circuit explained in *Walk Haydel & Associates, Inc. v. Coastal Power Production Co.*, 517 F.3d 235, 241-42 (5th Cir. 2008),

> Ultimately, the plaintiff must show by a preponderance of the evidence that jurisdiction is proper.  Often, the determination of whether this standard is met is resolved at trial along with the merits.  This is especially likely when the jurisdiction issue is intertwined with the merits and therefore can be determined based on jury fact findings.  In this situation it is often "preferable that [the jurisdictional] determination be made at trial, where a plaintiff may present his case in a coherent, orderly fashion and without the risk of prejudicing his case on the merits."  But this court has said that after a pretrial evidentiary hearing confined to the jurisdictional issue, where both sides have the opportunity to present their cases

jurisdiction, the district court may consider the record before it, including "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002)(*quoting Thompson v. Chrysler Motors Corp.*, 755 F.3d 1162, 1165 (5th Cir. 1985)), *cert. denied*, 540 U.S. 814 (2003); *Kelly Law Firm, P.C. v. An Attorney for You*, 679 F. Supp. 2d 755, 762 (S.D. Tex. 2009). The court has discretion as to the type and amount of discovery it will allow, but unless there is a full and fair hearing, it should not act as a factfinder and must construe all disputed facts in favor of the plaintiff. *Walk Haydel*, 517 F.3d at 241. On a motion to dismiss under Rule 12(b)(2), uncontroverted allegations in plaintiff's complaint are taken as true, and conflicts between facts in the parties' affidavits must be resolved in plaintiff's favor for purposes of the *prima facie* case of personal jurisdiction. *Johnston*, 523 F.3d

---

fully, the district court can decide whether the plaintiff has established jurisdiction by a preponderance of the evidence. [footnotes omitted]

The panel further opined, *id.* at 241.

If the court determines that it will receive only affidavits or affidavits plus discovery materials, these very limitations dictate that a plaintiff must make only a prima facie showing of jurisdictional facts through the submitted materials in order to avoid a defendant's motion to dismiss. Any greater burden such as proof by a preponderance of the evidence would permit a defendant to obtain a dismissal simply by controverting the facts established by a plaintiff through his own affidavit and supporting materials.

at 609; *Kelly Law Firm*, 679 F. Supp. 2d at 762; *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002).  Nevertheless, the court is not required to credit conclusory allegations even if they are uncontroverted.  *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001).

A court must find that it has personal jurisdiction over that defendant before it makes any decision on the merits. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 623, n.2 (5th Cir. 1999)("Personal jurisdiction is an essential element of the jurisdiction of a district court, without which it is powerless to proceed to an adjudication.").

Under the federal rules, except where a federal statute provides for broader personal jurisdiction, the district court's personal jurisdiction is coterminous with that of a court of general jurisdiction of the state in which the district court sits. *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 418 (5th Cir. 2001).  A federal court sitting in diversity, as is the case in this action, may exercise personal jurisdiction over a nonresident defendant if the forum state's long-arm statute confers personal jurisdiction over that nonresident defendant and if the exercise of personal jurisdiction satisfies due process under the United States Constitution. *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009), *citing Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007).  The Texas long-arm statute, Texas Civil Practice and

Remedies Code §§ 17.0421-.045,[8] extends jurisdiction to the limits of federal due process.  *Schlobohm v. Schapiro*, 784 S.W. 2d 355, 357 (Tex. 1990); *Gonzalez v. Bank of America Ins. Servs., Inc.*, No. 11-20174, 2011 WL 6156856 *3 (5th Cir. Dec. 12, 2011), *citing Stroman Realty, Inc. v. Antt*, 528 F.3d 382, 385 (5th Cir. 2008). Thus a plaintiff in a diversity action in federal court in Texas[9] need only demonstrate that (1) the defendant purposely availed himself of the benefits and protections of the forum state by establishing that the defendant had minimum contacts with the forum state, and (2) the exercise of personal jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Alpine View Co., Ltd. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000); *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007).

Personal jurisdiction can be either specific or general jurisdiction.  *Mink v. AAAA Develop., LLC.*, 190 F.3d 333, 336 (5th

---

[8] Section 17.042 provides in relevant part,

> In addition to other acts that may constitute doing business, a nonresident does business in this state if the nonresident:  (1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state; (2) commits a tort in whole or in part in this state; or (3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

[9] *See Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)("Because the Texas long-arm statute extends to the limits of federal due process, the two-step inquiry collapses into one federal due process analysis.").

Cir. 1999). "Where a defendant 'has continuous and systematic general business contracts' with the forum state, the court may exercise 'general jurisdiction over any action brought against the defendant [regardless of whether the action is related to the forum contacts]." *Luv N' Care*, 438 F.3d at 469, *citing Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984). *See also Access Telecom, Inc. v. MCI Telecomms. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)("General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed."), *cert. denied*, 531 U.S. 917 (2000). "[T]he minimum contacts inquiry is broader and more demanding when general jurisdiction is alleged, requiring a showing of substantial activities in the forum state. *Jones v. Petty-Ray Geophysical Geosource, Inc.*, 954 F.2d 1061, 1068 (5th Cir.), *cert. denied*, 506 U.S. 867 (1992). "[V]ague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts are insufficient to support general jurisdiction." *Johnston*, 523 F.3d at 610.[10]

---

[10] In *Johnston*, the Fifth Circuit discussed how extremely difficult it is to establish general jurisdiction over a nonresident defendant. 523 F.3d at 610-11. The panel examined the Supreme Court's ruling in *Helicopteros*, 466 U.S. at 418-19, in which it found that defendant's contacts with Texas purchasing helicopters, spare parts, and accessories for more than $4 million over a six-year period from a Texas company, sending management and maintenance personnel to Texas for technical consultations and prospective pilots to Texas for training, and receiving a check for more than $5 million drawn on a Texas bank were insufficient to support personal jurisdiction. Among other cases from this Circuit, *Johnston* cited *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003), in which the Fifth Circuit concluded that general jurisdiction did not exist even

If the defendant has relatively few contacts, the court may still exercise specific personal jurisdiction over that party if the suit "'arises out of' or is related to the defendant's contacts with the forum." *Helicopteros*, 466 U.S. at 414 & n.8. Furthermore the Fifth Circuit has concluded that specific jurisdiction is "a claim-specific inquiry:  'A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim.'" *McFadi*n, 587 F.3d at 759, *quoting Seiferth v. Helicopteros Atuneros, Inc*., 472 F.3d 266, 271 (5th Cir. 2006).  Where all the claims arise from the same forum contacts, however, a court does not have to examine jurisdictional contacts on a claim-by-claim basis.  *Moncrief Oil Inter., Inc. v. OAO Gazprom*, 414 S.W. 3d 142. 150-51 (Tex. 2013).

---

though the defendant regularly arranged and received interline shipments to and from Texas and sent sales people to Texas to develop business, negotiate contracts and service national accounts; *Wilson v. Belin*, 20 F.3d 644, 651 (5th Cir. 1994)("Even if [the defendant's] contacts with Texas via his short-lived malpractice insurance arrangement through a Texas law firm and his multi-year *pro bono* association with the historical society were arguably continuous, we hold that they were not substantial enough to warrant the imposition of general personal jurisdiction over him."); *Access Telecom*, 197 F.3d at 717 (in order to confer general jurisdiction it is not sufficient that a corporation do business in Texas; it must have a business presence in Texas); *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000)(holding that general jurisdiction did not exist where the defendant occasionally sold products to entities in Texas that used the defendant's products for projects in Texas and the defendant's employees made field visits to Texas between December 1992 and December 1993). *Johnston*, 523 F.3d at 610-12 (concluding that Multidata's sale of approximately $140,000 worth of goods over a five-year period to Texas customers and its employees' occasional travels to Texas to service equipment or attend trade conventions did not support general jurisdiction over Multidata).

Furthermore, the Fifth Circuit has established a three-step analysis for determining whether specific jurisdiction exists: "'(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there[11]; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts[12]; and (3) whether the exercise of personal jurisdiction is fair and reasonable.'" *Seiferth*, 472 F.3d at 271, *quoting Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002). While a court may examine "conduct beyond a particular business transaction" in the purposeful availment analysis, "purposeful availment alone will not support an exercise of specific jurisdiction unless the defendant's liability arises from or relates to the forum contacts." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W. 3d 33, 341 (Tex. 2009). The minimum contacts review is fact-intensive, and no single contact is decisive; "the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being

---

[11] Purposeful availment requires a defendant to seek some benefit, advantage or profit by "availing" itself of the jurisdiction. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W. 3d 777, 785 (Tex. 2005).

[12] The litigation must also "result from the alleged injuries that 'arise out of or relate' to those activities." *Guardian Royal Exch. Assurance Ltd. v. English China Clays, P.L.C.*, 815 S.W. 2d 223, 228 (Tex. 1991), *citing Burger King*, 471 U.S. at 472. For specific jurisdiction, there "must be a substantial connection" between the nonresident defendant's contacts with the forum state and the "operative facts of the litigation." *Guardian Royal*, 815 S.W. 2d at 229-33.

haled into court' in that jurisdiction.  The defendant 'must not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or third party.'" *McFadin*, 587 F.3d at 759, *citing Luv N' Care*, 438 F.3d at 470 (*citing World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), and *Electrosource, Inc. v. Horizon Battery Tech., Ltd.*, 176 F.3d 867, 871-72 (5th Cir. 1999)(*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)).  Thus specific jurisdiction may not be based upon the mere fortuity that a plaintiff is a Texas resident. *Santander Consumer USA, Inc. v. Shults Ford, Inc.*, Civ. A. No. 3:11-CV-614-L, 2011 WL 2601520, *4 (N.D. Tex. June 30, 2011), *citing Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986).

Once the plaintiff has established that the defendant has minimum contacts with the forum state, the burden shifts to the defendant to show that assertion of jurisdiction would be unfair. *Walk Haydel*, 517 F.3d at 245.  In determining whether the exercise of jurisdiction is fair and reasonable, the court examines five factors:  "'(1) the burden on the nonresident defendant, (2) the forum state's interests, (3) the plaintiff's interest in securing relief, (4) the interest of the interstate judicial system in the efficient administration of justice, and (5) the shared interest of the several states in furthering fundamental social policies.'"  *McFadin*, 587 F,3d at 759-60, *quoting Luv N' Care*, 438 F.3d at 473.  If the plaintiff fails to establish the existence of minimum contacts with the forum state,

the court need not reach the question of whether personal jurisdiction would offend traditional notions of fair play and substantial justice. *Renoir v. Hantman's Associates, Inc.*, 230 Fed. Appx. 357, 360(5th Cir. 2007).

The mere fact that a party contracted with a resident of Texas is insufficient to establish minimum contacts necessary to support personal jurisdiction. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007)("Merely contracting with a resident of the forum state does not establish minimum contacts."); *Cardinal Health Solutions, Inc. v. St. Joseph Hosp. of Port Charlotte, Fla. Inc.*, 314 Fed. Appx. 744, 745 (5th Cir. 2009). Nor does the exchange of communications in the developing and performing of a contract constitute purposeful availment of the benefits and protections of the laws of Texas. *Id.; id.; Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 344 (5th Cir. 2004). "[P]urchases and related trips, standing alone, are not a sufficient basis for a State's assertion of jurisdiction." *Helicopteros*, 466 U.S. at 417. Moreover jurisdiction may not be based on the fortuity of one party residing in the forum state. *McFadin*, 587 F.3d at 760. Mere foreseeability, by itself, does not create personal jurisdiction. *Moncrief Oil*, 481 F.3d at 313.

The court must examine the quality and nature of the defendant's activities in the forum in their totality to decide whether the defendant purposely availed itself of the privileges offered by the forum state. *Id., citing Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999).

The question whether a court has personal jurisdiction over a nonresident defendant is a question of law.  *Moncrief Oil Inter. v. OAO Gazprom*, 414 S.W. 3d 142, 150 (Tex. 2012).

**Fed. Rule of Civ. P. 12(b)(6)**

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor of the plaintiff and take all well-pleaded facts as true. *Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011), *citing Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).  The plaintiff's legal conclusions are not entitled to the same assumption.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."), *citing Bell Atlantic Corp. v. Twombly*, 556 U.S. 662, 678 (2007); *Hinojosa v. U.S. Bureau of Prisons*, 506 Fed. Appx. 280, 283 (5th Cir. Jan. 7, 2012).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ."  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . .

. a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). *Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*,556 F.3d 261, 263 n.2 (5th Cir. 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974). "'A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Montoya v. FedEx Ground Package System, Inc.*, 614 F.3d 145, 148 (5th Cir. 2010), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility standard is not akin to a "probability requirement," but asks for more than a "possibility that a defendant has acted unlawfully." *Twombly*, 550 U.S. at 556. Dismissal is appropriate when the plaintiff fails to allege "'enough facts to state a claim to relief that is plausible on its face'" and therefore fails to "'raise a right to relief above the speculative level.'" *Montoya*, 614 F.3d at 148, *quoting Twombly*, 550 U.S. at 555, 570.

  In *Ashcroft v. Iqbal*, 556 U.S. at 679, the Supreme Court stated that "only a complaint that states a plausible claim for

relief survives a motion to dismiss," a determination involving "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" under Rule 12(b). *Iqbal*, 129 S. Ct. at 1949.   The plaintiff must plead specific facts, not merely conclusory allegations, to avoid dismissal. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

Dismissal under Rule 12(b)(6) is proper not only where the plaintiff fails to plead sufficient facts to support a cognizable legal theory, but also where the plaintiff fails to allege a cognizable legal theory. *Kjellvander v. Citicorp*, 156 F.R.D. 138, 140 (S.D. Tex. 1994), *citing Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 594 (5th Cir. 1991); *ASARCO LLC v. Americas Min. Corp.*, 832 B.R. 49, 57 (S.D. Tex. 2007).  "A complaint lacks an 'arguable basis in law' if it is based on an indisputedly meritless legal theory' or a violation of a legal interest that does not exist." *Ross v. State of Texas*, Civ. A. No. H-10-2008, 2011 WL 5978029, at *8 (S.D. Tex. Nov. 29, 2011).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. *Great Plains Trust Co v. Morgan Stanley Dean*

*Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)("District courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004)("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion. [citations omitted]").  The court should deny leave to amend if it determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ."  6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990).

"Rule 12(b)(6) is not a procedure for resolving contests about the facts or the merits of a case." *Gallentine v. Housing Authority of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 794 (E.D. Tex. Jan. 22, 2012), *citing* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:  Civil 2d* § 1356, at 294 (1990).

As noted, on a Rule 12(b)(6) review, although generally the court may not look beyond the pleadings, the Court may examine the complaint, documents attached to the complaint, and documents attached to the motion to dismiss to which the complaint refers and which are central to the plaintiff's claim(s), as well as matters of public record. *Lone Star Fund V (U.S.), L.P. v.*

*Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir. 2010), *citing Collins*, 224 F.3d at 498-99; *Cinel v. Connick*, 15 F.3d 1338, 1341, 1343 n.6 (5th Cir. 1994).  *See also United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003)("the court may consider . . . matters of which judicial notice may be taken").  Taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) review and does not transform the motion into one for summary judgment.  *Funk v. Stryker Corp.*, 631 F.3d 777, 780 (5th Cir. 2011).  "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

**Factual Background According to Second Amended Complaint**

The factual background giving rise to this case is complex.

According to the Second Amended Complaint, after Donavan D. Smith, known also as "Pete" Smith, passed away, his widow, Mary Marshall Smith, also called "Sally" Smith, died in 1992.  Her will, dated October 24, 1977, and a codicil, dated August 24, 1987, created a residuary trust, the "Mary Marshall Smith Trust," and the trust assets were distributed into two jointly managed "Beneficiary Trusts," i.e., the "Mary Marshall Smith Trust for the benefit of Katharine M. Marshall" for the lifetime of her sister Katharine, and the "Mary Marshall Smith Trust for the benefit of Margaret Murdoch," for the lifetime benefit of her other sister,

Margaret.   After the deaths of these two sisters, the remaining principal and undistributed income in the Beneficiary Trusts were combined into the "Mary Marshall Smith Trust," which, according to terms of the Will, was to be known as the "Pete and Sally Smith Foundation."   Thus all these entities are identities of the Mary Marshall Smith Trust at different times, according to the conditions and accounting requirements in the Will.   At all relevant times, Wells Fargo Bank, N.A. served as Trustee or Co-Trustee of these entities.

During her life, Margaret Murdoch, who was co-Trustee with Wells Fargo of her Beneficiary Trust, purportedly decided to name the Michigan 4-H Foundation and Michigan State University[13] as the final beneficiaries of the Mary Marshall Smith Trust after she died.   When she passed away in 2009, the Beneficiary Trusts terminated, and Wells Fargo became the sole Trustee of the Trusts, now to be known as the "Pete and Sally Smith Foundation."   The Trustee then authorized the trust assets to be distributed within three years by charitable gifts to qualifying nonprofit organizations.   Alternatively, the Will permitted the incorporation of the Pete and Sally Smith Foundation as a private charitable foundation, with the remaining assets transferred to it and with distributions from it to be effected within three years.

While the Beneficiary Trusts were still in existence, the Mary Marshall Smith Trust held mineral interests on property

---

[13] Ultimately Michigan State University assigned its interest to Michigan 4-H.   #35, Ex. 2, Michigan 4-H's Answer to Petition in South Carolina litigation.

in Dimmit County, Texas, located on Lots Two, Three, Six and Seven in Block 184, Subdivision "L" in the Taft-Catarina Properties Subdivision, comprised of approximately 308.24 acres known as the "Briscoe Friday Smith" tract (hereinafter "the Smith Tract").  In 2010 Anadarko obtained an oil and gas lease of the Trusts' mineral interest in the Smith Tract from Wells Fargo, which executed the lease as Trustee of the Mary K. Marshall Smith Trust FBO Katharine M. Marshall and FBO Margaret M. Murdoch.  Since Margaret Murdoch, the last of the two sister beneficiaries, had died the year before, however, the Beneficiary Trusts should have terminated before Anadarko leased the property.

Surrounding the Smith Tract is a 5,468.90 acre tract known as the "Briscoe Family Ranch" (hereinafter the "Ranch"), in which the Beneficiary Trustees had no mineral or royalty interests and in which unrelated third parties hold the mineral interests. Anadarko's first oil well was drilled on the Ranch.  In error Anadarko sent division orders for that well to Wells Fargo as Trustee of the Beneficiary Trusts.  Anadarko claims that Wells Fargo knew that the Beneficiary Trusts owned no mineral interest in the Ranch, but Wells Fargo nevertheless signed these division orders and represented to Anadarko that the Beneficiary Trusts did hold the title to the Ranch property.  Several more wells were drilled on the Ranch property and fell under these original division orders, and Anadarko provided notice of each subsequent well in accounting statements sent out along with royalty checks to royalty recipients, including, erroneously, the Beneficiary Trusts.  Anadarko's mistaken royalty payments to the Beneficiary

Trusts for wells located on the Ranch were made from March 25, 2011 through December 31, 2013.

Subsequently Anadarko drilled three wells on the Smith Tract.  Anadarko properly computed the Beneficiary Trusts' interests in this tract and made correct royalty payments to them, but also continued the erroneous payments to them for the wells on the Ranch.  The multiple mistaken checks sent to Wells Fargo as Trustee of the Mary Marshal Smith Trust FBO Katharine Marshall for production from wells located on the Ranch totaled $1,238,143.59, while those for the Mary Marshal Smith Trust Fund FBO Margaret Murdoch amounted to $412,716.03.  The Trustee endorsed and cashed the checks and kept the funds despite the fact that the Trusts lacked any title to any mineral interest in the Ranch and were not entitled to the proceeds of any production from the Ranch.

Anadarko asserts that each division order executed by Wells Fargo as Trustee included agreements that the Beneficiary Trusts would "indemnify and reimburse [Anadarko] any amount attributable to an interest to which the undersigned is not entitled."

Once Anadarko discovered its mistake, it made payments to the correct, third-party royalty interest owners on the Ranch to make them whole.  On or around April 14, 2014, Anadarko notified Trust Asset Manager Jonathan Johnson, an employee of Wells Fargo Bank, N.A., of the erroneous payments to the Beneficiary Trusts and asked that Wells Fargo return the funds, but Wells Fargo has refused to repay Anadarko.

Meanwhile, after the Beneficiary Trusts were united into the Mary Marshall Smith Trust (a/k/a the Pete and Sally Smith Foundation, before its incorporation), the erroneous payments were placed in that Trust by operation of law.  Trustee Wells Fargo purportedly did not know of Margaret Murdoch's attempts to name the Michigan 4-H Foundation as the beneficiary of her Trust and disputed Michigan 4-H's claims, moved to retain all the assets, and sought to incorporate the Trust as the Pete and Sally Smith Foundation, which could continue into perpetuity.  Michigan 4-H, on the other hand, tried to obtain all of the trust assets as a charitable gift to itself from Mrs. Murdoch.  On August 29, 2011, the Trustee filed suit against the Michigan 4-H Foundation, Michigan State University, and the State of South Carolina, in a Greenville County, South Carolina state court, where Mary Marshall Smith's will was probated.  Anadarko alleges that besides the State of South Carolina, none of the parties was a South Carolina resident.  Although the litigation went on for a couple of years, the parties never informed Anadarko about its existence.  During its pendency, Wells Fargo never raised the issue of whether any party held title to royalties from the Ranch property.  After approximately two years, the parties began to talk settlement. Anadarko claims, but Michigan 4-H denies, that Michigan 4-H hired a Texas attorney to evaluate the Texas mineral interests, the Anadarko leases on them, the future royalty potential, the amounts already received by the Pete and Sally Smith Foundation, and the impact of accepting Texas real property in settlement of the litigation.

On December 12, 2013 the parties settled the claims
arising among themselves, which included the payment and
conveyance of $2.25 million in Trust assets and a 33.33252 percent
portion of the not-yet-incorporated Pete and Sally Smith
Foundations's Dimmit County, Texas oil, gas and mineral interests
in the Smith Tract to Michigan 4-H.  To fund the $2.25 million
cash payment accepted by the Michigan 4-H Foundation as part of
the settlement, the Trustee used some of Anadarko's mistaken
royalty payments from the Ranch oil and gas wells and leases.
Anadarko charges that the Michigan 4-H Foundation "knowingly"
accepted the title and ownership of the Texas real property on the
Ranch and royalty payments even though it knew they were subject
to Anadarko's Texas leases and division orders.[14]  In addition the

_____

[14] This Court observes that the Second Amended Complaint
fails to state any facts to support this conclusory allegation.
Moreover Michigan 4-H could not actually have accepted title and
ownership to the oil and gas interests on the Ranch when the
Trusts did not own the Ranch and thus could not have given title
and ownership to Michigan 4-H.  What is at issue is not title to
the Ranch property, but some royalties that should have gone to
the real owners but were allegedly mistakenly transferred to the
Trustee and then to the Trusts and ultimately some to Michigan 4-
H.
    The Fifth Circuit opined in *S.E.C. v. Resource
Development Intern., LLC*, 487 F.3d 295, 301 (5th Cir. 2007),
"'[T]he transferees' knowing participation is irrelevant [to the
determination of whether the transfer was made with intent to
delay or defraud a debtor] under the statute' for purposes of
establishing the premise of (as opposed to liability for) a
fraudulent transfer. . . . The statute requires only a finding of
fraudulent intent on the part of the "debtor."  Anadarko's Second
Amended Complaint, ¶ 48, alleges that the debtor, "Wells Fargo as
Trustee of the Beneficiary Trusts, the Mary Marshall Smith Trust,
and/or the Pete & Sally Smith Foundation (prior to incorporation)
transferred $2.25 million to the [transferee] Michigan 4-H
Foundation without receiving a reasonably equivalent value in
exchange for the transfer, leaving the debtor insolvent as a
result of the transfer in violation of Section 24.006(a) of the
Texas Business and Commerce Code."  *See also Quilling v. Schonsky*,

Mary Marshall Smith Trust and the Pete and Sally Smith Foundation were reformed and incorporated into the Pete and Sally Smith Foundation in perpetuity, and the remaining assets of the Mary Marshall Smith Trust were formally gifted to the incorporated foundation, with Wells Fargo named the Trustee and awarded past and future pay for its services as Trustee.   The parties then released all claims against each other.

In early 2014 the Beneficiary Trusts informed Anadarko that the Trusts had executed quit claim deeds regarding the minerals owned by the Trusts in the Smith Tract to the Michigan 4-H Foundation and the Pete and Sally Smith Foundation.  Not knowing about the South Carolina litigation or the reason for the quit claim deeds, Anadarko, in reliance on the signed division orders and in accordance with existing title opinions, began and continued to pay the Pete and Sally Smith Foundation and the Michigan 4-H Foundation royalty payments relating to their proportionate shares of the Smith Tract in Texas.

## Applicable Substantive Law

As the Honorable Sim Lake in *Pemex Exploracion y Produccion v. BASF Corp.*, Civ A. Nos. H-10-1997 and H-11-2019, 2013 WL 5514944, at *6-7 (S.D. Tex. Oct. 1, 2013), explains about money had and received, a cause of action which "belongs conceptually to the doctrine of unjust enrichment,"

> An action for restitution for money had and received "seeks to restore money where equity and good conscience require restitution. . . it is not premised on wrongdoing, but seeks

247 Fed. Appx. 583, 584 (5th Cir. Sept. 18, 2007).

to determine to which party, in equity, justice, and law, the money belongs, [*Edwards v. Mid-Continent Office Distributors, LP*, 252 S.W. 3d 833, 837 (Tex. App.-Dallas 2008, pet. denied)], *citing Staats v. Miller*, 150 Tex. 581, 243 S.W. 2d 686, 687 (Tex. 1951)). Such claims seek "to prevent unconscionable loss to the payor and unjust enrichment to the payee." *Id. at 837 (citing Bryan v. Citizens National Bank in Abilene*, 628 S.W. 2d 761, 763 (Tex. 1982)).

As these broad and general descriptions demonstrate, a cause of action for money had and received is "less restricted and fettered by technical rules and formalities than any other from of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which belongs to the plaintiff." [*Id., quoting Staats*, 243 S.W. 2d at 687-88.]

Anadarko, which has its principal place of business in Texas, maintains that Texas law applies to the transfers to the Foundations because the transfers are connected to title to mineral interests in Texas and to division orders that are Texas contracts that establish the obligation to repay Anadarko, a Texas resident, with performance occurring in Texas. It notes that the Pete and Sally Smith Foundation claimed that Texas statutes governed their mineral interests when their counsel communicated with Anadarko in the middle of 2014. Lastly, Anadarko submits, Michigan 4-H hired Texas counsel to evaluate Texas mineral interests which were subject to the existing Anadarko mineral leases and division orders before Michigan 4-H agreed to accept ownership of those interests.[15]

---

[15] Because the parties disagree about the hiring of Texas counsel and because there has been no hearing held, the Court should not act as a factfinder and must construe all disputed facts in favor of the plaintiff, Anadarko *Walk Haydel*, 517 F.3d at 241. Nevertheless, the Court finds the fact that Michigan 4-H

Section 24.005(a) of TUFTA states, "A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor." Section 24.005(b) lists a number of factors the Court may consider in determining "actual intent" under subsection (a)(1).

TUFTA covers the fraudulent transfer of funds, as well as of property; "[a] TUFTA plaintiff seeks to recover "judgment for the value of the asset transferred, not the specific asset itself" so spending transferred funds "does not shield a recipient of fraudulently-transferred funds from liability." *Janvey v. Alguire*, 846 F. Supp. 2d 662, 672 (N.D. Tex. 2011). *See also Walker v. Anderson*, 232 S.W. 3d 899 (Tex. App.--Dallas 2007)(shareholder fraudulently transferred funds from company to himself in violation of TUFTA).

The Second Amended Complaint, #28 at ¶¶ 47-49, alleges the following fraudulent transfers under TUFTA § 24.006(a)("A transfer made . . . by a debtor is fraudulent to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at

---

hired a Texas lawyer to evaluate the Smith Tract issue irrelevant to whether Texas law applies here.

that time or the debtor became insolvent as a result of the transfer."):

47.   Anadarko mistakenly made royalty payments to Wells Fargo as Trustee of the Beneficiary Trusts associated with mineral interests to which the Beneficiary Trusts did not have title.   Therefore, Wells Fargo as Trustee of the Beneficiary Trusts, the Mary Marshall Smith Trust and/or the Pete & Sally Smith Foundation (prior to incorporation) was a debtor to its creditor Anadarko in the amount of funds mistakenly transferred to Wells Fargo.  [citation omitted]

48.   Thereafter, Wells Fargo as Trustee of the Beneficiary Trusts, the Mary Marshall Smith Trust and/or the Pete & Sally Smith Foundation (prior to incorporation) transferred $2.25 million to the Michigan 4-H Foundation without receiving a reasonably equivalent value in exchange for the transfer leaving the debtor insolvent as a result of the transfer in violation of Section 24.006(a) of the Texas Business and Commerce Code.

49.   Additionally, Wells Fargo as Trustee of the Beneficiary Trusts, the Mary Marshall Smith Trust and/or the Pete & Sally Smith Foundation (prior to incorporation) transferred at least $2,200,115.75 in cash and at least $4,000,000.00 in mutual funds and other assets to Wells Fargo as Trustee of the Pete & Sally Smith Foundation (after incorporation as a private foundation) without receiving a reasonably equivalent value in exchange for the transfers and leaving the debtor insolvent as a result of the transfer in violation of Section 24.006(a) of the Texas Business and Commerce Code.

Anadarko alternatively pleads that if the Court were to hold that South Carolina law applies rather than Texas law, South

Carolina Code § 27-23-10(A)[16] governs fraudulent conveyances and invalidates fraudulent conveyances:

> Every gift, alienation, bargain, transfer and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties and forfeitures by guileful, covinous [defined by *Black's Dictionary* (6th ed. West, 1990) as "deceitful" or "fraudulent"], or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrated and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

South Carolina law makes key distinctions between existing creditors and subsequent creditors, and between transfers made without consideration and transfers made for valuable, but substantially insufficient consideration. *Audio Investments*, 203 F. Supp. 2d at 560. There are two circumstances in which a conveyance may be set aside for existing creditors: (1) a

---

[16] Also known as the "Elizabeth Statute" because the original version of the law was enacted during the reign of Queen Elizabeth I. *Audio Investments v. Robertson*, 203 F. Supp. 2d 555, 566 (D.S.C. 2002), *aff'd*, 67 F. Appx. 795 (4th Cir. 2003). Anadarko's Second Amended Complaint, #25 at p. 17 n.3, states, "South Carolina is the only U.S. state to follow the Statute of Elizabeth."

transfer, made for valuable consideration, will be set aside if (a) it was made by the grantor with actual intent to defraud his creditors, (b) the grantor was indebted at the time of the transfer, and (c) the grantor's intent is imputable to the grantee; or (2) where the transfer was not made for a valuable consideration, if (a) the grantor was indebted to the plaintiff at the time of the transfer, (b) the conveyance was voluntary (i.e., made without valuable consideration), and (c) the grantor failed to retain sufficient property to pay the indebtedness to the plaintiff in full--not merely at the time of the transfer, but when the creditor seeks to collect his debt. *Mathis v. Burton*, 460 S.E. 2d 606, 408 (S.C. Ct. App. 1995).

Subsequent creditors may have conveyances set aside when (1) the conveyance was 'voluntary,' . . . and (2) it was made with a view to future indebtedness or with an actual fraudulent intent on the part of the grantor to defraud creditors." *Id.*

"Although there is a conflict of authority as to whether or not [the Statute of Elizabeth] applies to personal property,' 37 *C.J.S. Fraudulent Conveyances* § 199," a South Carolina district court, observing that "[r]esearch revealed no South Carolina case addressing this issue," has held that cash transfers are voidable as fraudulent conveyances under the Statute of Elizabeth. *Fabrica la Estrella S.A. de C.V. Banda*, 6:06-466-HMH, 2007 WL 39428, *3 (D.S.C. Jan. 4, 2007)("Based on the broad language and equitable nature of the Statute . . . the transfer of funds . . . is a 'transfer' under the broad and plain language of "section 27-23-10(A)." *In accord*, *PSC Nitrogen, Inc. v. Ross Development Corp.*,

127 F. Supp. 3d 568, 592 (D.S.C. 2015)(*quoting Fabrica*, and citing three South Carolina decisions voiding cash transfers under the statute and *Smith v. Mutual Life Ins. Co. of New York*, 158 F. 365, 366 (C.C.D. Mass. 1907)("A fraudulent transfer of money is within the Statute of Elizabeth as well as a fraudulent transfer of land or goods.")).

The Second Amended Complaint, ¶¶ 54-57, alleges the following under the Statute of Elizabeth:

> 54.  Anadarko is the "creditor" of the Mary Marshall Smith Trust and the Beneficiary Trusts as that term is understood in the Statute of Elizabeth because the trusts owed Anadarko for the mistaken royalty payments; the trusts are understood as debtors for the same reasons. *See Royal Z. Lanes, Inc. [v. Collins Holding Corp.*, 337 S.C. 592, 594 S.E. 2d 621, 622 (S.C. 1999)]. Anadarko's claims arose at the time of each mistaken royalty payment.
> 55.  After receiving the mistaken payments, the Mary Marshall Smith Trust transferred funds and real property (the mineral interests) to the Michigan 4-H Foundation and the Pete and Sally Smith Foundation (the "Foundations") without receiving valuable consideration in exchange for the transfers and was insolvent or became insolvent as a result of the transfers.  Settlement of the South Carolina litigation was not valid consideration for either transfer.  In order for a compromise to serve as consideration for a settlement, there must be some matter of doubt as to whether a legal obligation exists or not.  The Mary Marshall Smith Trust had no legal obligation to make a gift to either Foundation.  And the Michigan 4-H Foundation and Pete and Sally Smith Foundation--would-be gift recipients from the Marry Marshall Smith Trust--possessed no legal right to a gift from the Trust. Compromise where no legal obligation exists cannot serve as consideration for a settlement.
> 56.  Because Anadarko's claims pre-dated the transfers to the Michigan 4-H Foundation

and the Pete and Sally Smith Foundation, the transfers violated the Statute of Elizabeth. *Mathis*, 460 S.E. 2d 406 at 408 [*sic*].  In the complained-of transfers, no valuable consideration passed from the Foundations to the Mary Marshall Smith Trust.

57.  Anadarko sustained actual damages of $1,650,859.62 associated with the fraudulent transfers to the Foundations. Under the Statute of Elizabeth, the first transferees, Michigan 4-H Foundation and the Pete and Sally Smith Foundation, are liable to Anadarko for the amount necessary to satisfy its claim and Anadarko is entitled to avoidance of transfers to the Foundations to the extent of that amount.

**Michigan 4-H's Motion to Dismiss (#30)**

Michigan 4-H addresses the four claims against it to determine if specific personal jurisdiction over it in Texas exists for each of the claims.

First it argues that the fraudulent transfer and money had and received claims do not arise out of or relate to any alleged Michigan 4-H contact with Texas.  The essence of each is that the Trust Defendants received purportedly erroneous royalty payments arising from and related to oil and gas wells and leases on the Ranch and then used a portion of them to fund the South Carolina cash settlement payment to Michigan 4-H.  Sec. Am. Complaint (#25) at ¶ 27.  Anadarko does not dispute that it did not make any of the allegedly mistaken payments to Michigan 4-H. *Id.,* ¶¶ 16 and 18.  Because Michigan 4-H acquired its mineral interest in the Smith tract only after the time of the allegedly mistaken payments, these claims against Michigan 4-H cannot have arisen from or relate to Michigan 4-H's later ownership.  When Michigan 4-H received these mineral interests, it contracted with

an out-of-state entity to settle an out-of-state lawsuit at a time when Michigan 4-H had no knowledge, either actual or alleged, nor any alleged claim in connection with the mineral interests because no claim had been made. #25, ¶¶ 26-27, 21; Ex. A, Howell Affid., ¶¶ 11, 15. The South Carolina settlement had no connection to Texas and cannot serve as the basis for personal jurisdiction in Texas over Michigan 4-H; the fraudulent transfer and money had and received claims against Michigan 4-H were based on its receipt of cash from out-of-state Trust Defendants under a South Carolina settlement agreement. *Waller Marine, Inc. v. Magie*, 463 S.W. 3d 614, 622 (Tex. App.--Houston [14th Dist.] 2015, no pet.)(concluding no personal jurisdiction over nonresident defendants where claims for unjust enrichment were based on payments plaintiffs made to Texas resident defendants who subsequently made payment to nonresident defendants under a separate consulting agreement); *Barrow v. Sutton*, Civ. A. No. H-14-200, 2014 WL 3485188, *4 (S.D. Tex. July 11, 2014)(holding that court lacked personal jurisdiction over nonresident defendant for claims of money had and received where the defendant did not reach out to plaintiff in Texas for business and the record showed few interactions (conversations and a single email) between plaintiff and defendant); *Prosperity Bank v. Balboa Music Festival, LLC*, Civ. A. No. 4:13-CV-00288, 2014 WL 1023935, *3 (S.D. Tex. Mar. 13, 2014)(holding that a substantial part of the events giving rise to the money had and received claim occurred where the money was received). In the two-prong analysis for specific jurisdiction (whether the defendant "purposefully availed itself" of the

privilege of conducting activities in Texas and whether the defendant's liability arises from or relates to forum contacts), "purposeful availment alone will not support an exercise of specific jurisdiction unless the defendant's liability arises from or relates to the forum contacts." *Retamco*, 278 S.W. 3d at 341. Thus Anadarko's supplemental factual allegations that Anadarko hired Texas counsel to evaluate the mineral interests and its subsequent acceptance of the undisputedly correct royalty payments do not support a finding of personal jurisdiction because Anadarko's claims do not arise from those contacts.

Michigan 4-H further claims that the breach of contract claim, which notably was not asserted in Anadarko's first two pleadings, fails because there is no contract between Anadarko and Michigan 4-H. Furthermore, the contract that Anadarko seems to allege (that Michigan 4-H "knowingly adopted the division orders [contract] signed by the Beneficiary Trusts when [it] informed Anadarko of [its] new ownership in the Smith tract and accepted royalty payments premised upon obligations in the division orders (#25 ¶ 32)), even if applied to Michigan 4-H, does not arise out of the mistaken payment allegations. Moreover Michigan 4-H contends that statement is conclusory, untrue, and jurisdictionally irrelevant in light of the terms of the alleged contract. Finally, Michigan 4-H insists that it did not purposefully avail itself jurisdictionally in Texas.

Michigan 4-H emphasizes that it did not sign the division orders on which Anadarko bases its claim (#25, ¶ 31-32). The Texas Natural Resource Code § 91.401(3) defines a division

order as "a agreement signed by the payee directing distribution of proceeds from the sale of oil, gas, casing head gas, or other related hydrocarbons." Under this statute's definition, there is no division order applicable to Michigan 4-H in this dispute.

Michigan 4-H also argues that it did not "knowingly adopt" the division orders signed by the Trust Defendants--it was not aware of any orders applicable to the mineral interest until Anadarko alleged the breach of contract claim in its Second Amended Complaint. Ex. A, Howell Affid. ¶ 17. The division orders are related to the Ranch property, a separate interest that Michigan 4-H never owned nor from which it received any royalties. Ex. B, Division Orders for Ranch Property, produced by Anadarko; #25, Sec. Am. Compl., ¶¶ 15-17. The division of interest stated in the division order is not the division or interest properly attributed to the Smith Tract mineral interests and is not the rate at which Michigan 4-H or its predecessors have been paid.

While Anadarko claims that in the indemnity provision in the division orders the Trust Defendants "agreed to indemnify and repay Anadarko for any amounts Anadarko mistakenly paid to them which were attributable to interests to which they were not entitled (#25, ¶ 31)," the actual language in those orders is different: "***Owner*** agrees to indemnify and reimburse Payor for ***payments made to Owner in accordance with this DO*** if Owner does not have merchantable title to the oil and gas attributable to the Owner. [emphasis added by Michigan 4-H]" Ex. B, p. 2, ¶ 4 and p.

4, ¶ 4.[17]   Michigan 4-H maintains that, as discussed *supra,* it never received any payments "in accordance with the division order." Even if the Court accepts Anadarko's allegations as true, the division order could only activate the indemnity obligation for mistaken payments made by Anadarko to Michigan 4-H, of which there were none since all payments were made to the Trustee and then to the Trusts.   Thus Anadarko has not and cannot establish any contract right on which it can assert a claim for breach of contract.

Nor was there any purposeful availment of the privilege of conducting activities within the forum state by Michigan 4-H. It is black letter law that an individual's contract with an out-of-state party by itself cannot establish sufficient minimum contacts in the other party's home state; instead, the court must examine "prior negotiations, contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 222-23 (5th Cor. 2012), *citing Burger King*, 471 U.S. at 478; *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).   Even if there were a contract between Anadarko and Michigan 4-H, Anadarko has not alleged there were any prior negotiations or course of dealing between the two or any other facts that would support the claim of purposeful availment.   Even

---

[17] As the Court has noted, neither Michigan 4-H nor Trustee Wells Fargo nor the Trusts were owners of the minerals in the Ranch, so this provision in the division orders, which were contracts between Anadarko and the third-party owners of those minerals, does not apply to any of them.

if there were a division order applicable to Michigan 4-H, such an order is a boilerplate agreement that obligates a certain percentage of royalties to be paid to the mineral owner; it would not be interactive or involve anything other than the receipt of a royalty check in Michigan by Michigan 4-H. Michigan 4-H did not reach out to Texas to acquire the mineral interests, did not negotiate or even contact Anadarko before it received them, and has barely had contact with Anadarko since obtaining them.

Even if the Court finds that Michigan 4-H's minimal contacts were sufficient to subject it to personal jurisdiction in Texas, Michigan 4-H insists that the exercise of personal jurisdiction over it would offend traditional notions of fair play and substantial justice. Having to defend itself in litigation in Texas seeking to interfere with a settlement approved by the South Carolina court and the South Carolina Attorney General would substantially burden Michigan 4-H, a charitable foundation residing in Michigan. None of the witnesses with knowledge of Michigan 4-H or its settlement are in Texas. The interests of Texas in vindicating Anadarko's purported mistaken payments are not enough to counterbalance the burden it would impose on Michigan 4-H.

In sum, urges Michigan 4-H, Anadarko has failed to establish a prima facie case for Texas to exercise personal jurisdiction over it. Michigan 4-H requests that the Court dismiss the case pursuant to Rule 12(b)(2). Alternatively, Michigan 4-H asks the Court to dismiss Anadarko's breach of contract claim against it under Rule 12(b)(6).

**Anadarko's Response (#35)**

*Court's Discussion of Key Case*

Central to Anadarko's argument that this Court has personal jurisdiction over Michigan 4-H here is *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W. 3d 333, 339-40 (Tex. 2009), and progeny, both in accord and in distinguishing facts in other cases.   The Court briefly summarizes the facts and the holding of *Retamco.*

In *Retamco*, Retamco Operating, Inc. ("ROI"), a Texas corporation, after obtaining an interlocutory default judgment against another Texas corporation, Paradigm Oil, Inc. ("Paradigm"), for unpaid royalties in oil and gas leases on property located in a few Texas counties, amended its petition to add a claim for fraudulent transfer under the TUFTA, Texas Business & Commerce Code § 24.001-.013, against a new Defendant, Republic Drilling Company ("Republic"), a California corporation. ROI asserted that while the case was pending against Paradigm, Paradigm fraudulently assigned to Republic a 72% interest in Paradigm's oil and gas wells and leases in Fayette County, Texas and a 72% interest in an option to obtain an interest in a lease in Dimmit and Webb Counties, Texas.   ROI claimed that these fraudulent transfers left Paradigm insolvent and thus unable to pay damages for ROI's claims against it.

Making a special appearance, Republic answered and argued it lacked minimum contacts with Texas, but that even if it had them, that ROI's claim did not arise from nor is it related to those contacts, and that the assignment occurred in California,

not Texas.   Even if Republic did have sufficient minimal contacts
with Texas, moreover, Republic contended that the exercise of
personal jurisdiction over it in Texas would offend traditional
notions of fair play and substantial justice.   After a hearing,
the district court denied Republic a special appearance without
findings of fact or conclusions of law, the court of appeals
reversed, holding that Republic was not subject to personal
jurisdiction in Texas, and the case was appealed to the Texas
Supreme Court, which reversed the appellate court.

ROI argued that as a fraudulent transferee of oil and
gas interests, i.e., considered real property in Texas, Republic
is subject to personal jurisdiction in Texas.   The Texas Supreme
Court observed that in deciding if a defendant purposefully
availed itself of the benefits and privileges of conducting
business in Texas it must consider the following factors:   (1)
only the defendant's contacts with Texas were relevant; (2) the
asserted contacts were purposeful and not random, fortuitous or
attenuated; and (3) the defendants sought some benefit, advantage
or profit by availing itself of jurisdiction in the forum state.
278 S.W. 3d at 338-39, *citing Moki Mac River Expeditions v. Drugg*,
221 S.W. 3d 569, 575 (Tex. 2007).   The high court further noted
that the "quality and nature of the defendant's contacts rather
than their number" should be the court's focus.   *Id.* at 339.
Finding that Republic's contacts with Texas were purposeful, the
Supreme Court  opined,

> Republic was aware that the oil and gas
> interests it received were located in
> Fayette, Dimmit, and Webb Counties, Texas.

> Thus, Republic purposefully took assignment of Texas real property.  And while Republic may not have actually entered the state to purchase this real property, "[j]urisdiction . . . may not be avoided merely because the defendant did not physically enter the forum state." *Burger King*, 471 U.S. at 476 . . . . ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). Republic, by taking assignment of Texas real property, reached out and created a continuing relationship in Texas.  Under the assignment, it is liable for obligations and expenses related to the interests.  This ownership also allows Republic to "enjoy . . . the benefits and protections of [Texas laws].  [*Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W. 3d 777, 787 (Tex. 2005)(*citing International Shoe Co. v. Washington*, 326 U.S. 310. 319 (1945)).]  Unlike personal property, Republic's real property will always be in Texas, which leaves no doubt of the continuing relationship that this ownership creates.

*Id.* at 339.  Although the Court observed that sometimes "a single *contract* may meet the purposeful-availment standard, but not when it involves a single *contact* taking place outside the forum state,"[18] in contrast "the purchase and ownership of real property could 'involve[] many contacts over along period of time,' which would carry with it certain continuing obligations": *e.g.*, valuation and tax issues, and potential expenses of maintaining their interest." *Id.*  "[T]he location of the transferred asset is not fortuitous; the property's location is fixed in this state." *Id.*  Thus it is obvious "how Republic would benefit from the process and protections of Texas law." *Id.* at 339-40.  Moreover

---

[18] *Citing Michiana*, 168 S.W. 3d at 787.

if Republic decides to enforce rights in its interests in the oil and gas leases and wells, it must necessarily do so in Texas. *Id.* at 340.

The Texas Supreme Court further found that Republic's contacts with the forum state were not based on unilateral actions of a third party, but on its own conduct because Republic was a "willing participant in a transaction with an affiliated Texas company to purchase Texas real property." *Id.* Noting that Republic "went well beyond answering a phone call from a Texas resident or shipping goods to Texas," which acts "may be random or fortuitous," the Texas Supreme Court distinguished such conduct from the purposeful purchase of Texas real property in which "the location matters." *Id.*

Finally the high court emphasized that Republic pursued a "'benefit, advantage or profit' in Texas" and "by purchasing Texas real property, has purposefully availed itself of the privilege of conducting activities in Texas":  it obtained "valuable assets in Texas, including the right to enforce warranties and covenants related to the real property," it "reaped benefits from the property in the amount of approximately $1.2 million in revenues, and [it] has sold some of the property."  Id.

By itself, purposeful availment will not uphold specific personal jurisdiction if the defendant's liability does not arise from or relate to the forum contacts, i.e., there must be "a 'substantial connection between the defendant's contacts with the forum and the operative facts of the litigation,'" the latter necessitating consideration of the claims asserted in the case.

*Id.*  The court found that in this fraudulent transfer case, "the UFTA not only creates liability against 'the person for whose benefit the transfer was made, such as the debtor, but also against 'the first transferee of the asset,' or any 'subsequent transferee.'" *Id.* at 341.  Republic argued that the emphasis in the litigation should be on the assignment, which occurred in California, since the operative facts "will be whether reasonably equivalent value was given for the property and whether the leases were taken in good faith."[19]  The Supreme Court agreed the assignment was a significant operative fact, but additionally found that

> the real property itself will also be an
> operative fact, or at the very least, will
> have a substantial connection to the
> operative facts.  Without an asset, no
> fraudulent transfer can occur under the UFTA.
> *See id.* § 24.002(12)("'Transfer' means . . .
> disposing or parting *with an asset or an
> interest in an asset* . . . .")(emphasis
> added).  Here the Texas oil and gas interests
> are the assets.  Proof that these assets were
> transferred and an assessment of their value
> will be essential to the UFTA analysis;
> without that proof, the UFTA claim fails.

The UFTA states, "A transfer . . . is fraudulent . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in exchange for the transfer or obligation."  *Id.* at 341, *citing* Tex. Bus. & Com. Code §§ 24.005(a)(1), (2).  That Republic purportedly "received the transfer of Texas real property from a Texas resident, during the

---

[19] Citing Tex. Bus. & Com. Code §§ 24.005(a)(2), .006, .009.

pendency of a Texas suit, for the purpose of defrauding a Texas Resident" are minimum contacts sufficient to show that an alleged tort at least in part occurred in Texas.  Tex. Civ. Prac. & Rem. Code § 17.042 ("a nonresident does business in this state if the nonresident . . . commits a tort in whole or in part in this state"); *see also In re Tex. Am. Express, Inc.*, 190 S.W. 3d 720, 725 (Tex. App.--Dallas, no pet.)(a fraudulent transfer under the UFTA is a tort).

Finally, the Texas Supreme Court concluded that the assertion of jurisdiction over Republic comported with traditional notions of fair play and substantial justice after it considered the five factors set out in *Guardian Royal Exchange Assur., Ltd. v. English China Clays, PLC*, 815 S.W. 2d 223, 228 (Tex. 1991), *citing World-Wide Volkswagen*, 444 U.S. at 292, *Burger King*, 471 U.S. at 477, and *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 113 (1987), and found that they weighed heavily in favor ROI:  "(1) 'the burden on the defendant,' (2) the interests of the forum state in adjudicating the dispute, (3) 'the plaintiff's interest in obtaining convenient and effective relief,' (4) 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and (5) 'the shared interest of the several States in furthering fundamental substantive social policies."  Specifically the Court found that

> ROI has an interest in resolving this controversy in Texas because that is where the litigation began, Texas has an interest in resolving controversies involving real property within its borders and, given that the prior litigation deals with this property, it is most efficient to continue to

> use Texas as the forum to resolve the
> dispute. Moreover, California has much less
> of an interest in resolving Texas real
> property disputes than does Texas. Republic
> may be burdened by litigation outside its
> home state, but these other factors weigh
> heavily against this burden.

It therefore reversed the appellate court and "remand[ed] to  the
trial court for further proceeding consistent with this opinion."
*Id.* at 342.

*Anadarko's Response*

Anadarko maintains that to prevail on its motion to
dismiss under Rule 12(b)(2), Michigan 4-H must negate all of the
bases of jurisdiction alleged by Anadarko. *American Type Culture
Collection, Inc. v. Coleman*, 83 S.W. 3d 801, 807 (Tex. 2002).
Despite Michigan 4-H's objection that it did not participate in
the South Carolina litigation nor obtain the Texas property until
after the mistaken payment of royalties to the Smith Trusts based
on wells on the Ranch tract (in which Michigan 4-H never had an
interest) were made, Anadarko argues that Michigan 4-H's
negotiation for and receipt of the ownership of Texas real
property are sufficient to sustain the exercise of personal
jurisdiction by this Court because Anadarko's claims of personal
jurisdiction are based on Michigan 4-H's ownership of that Texas
real property.  Michigan 4-H has failed to negate this basis for
personal jurisdiction. Anadarko claims that specific jurisdiction
is appropriate when the litigation relates to real property owned
or assigned to the defendant. *Tabacinic v. Frazier*, 372 S.W. 3d

658, 667 (Tex. App.--Dallas 2012, no pet.)(In *Retamco*,[20] the Texas Supreme Court opined that "the purchase of real property in Texas does not establish a single contact . . . . Rather, the purchase and ownership of real property could 'involve[] many contacts over a long period of time,' which would carry with it certain continuing obligations, e.g., valuation and tax issues and potential expenses of maintaining the interest . . . . . Unlike personal property, real property will always be in Texas 'which leaves no doubt of the continuing relationship that this ownership creates.'").

        To support its argument, Anadarko turns to Michigan 4-H's evidence, the affidavit of Cheryl Howell attached to its motion, and points out that Howell concedes that Michigan 4-H does own "a 33.33151 percent share of the oil/gas/mineral interest in Dimmit County, Texas" (¶ 6), that Michigan 4-H, along with the South Carolina Attorney General and the Trusts, negotiated and settled the North Carolina lawsuit (¶11), and that pursuant to that settlement Michigan 4-H accepted a cash payment and the 33.33151 percent share of the interest in the property related to the Trust's assets (¶ 12).[21] According to Anadarko, it is

---

        [20] *Citing Retamco*, 278 S.W. 3d at 339 (Republic Drilling Company, "aware that the oil and gas interests it received were located in . . . Texas," "by taking assignment of Texas real property, reached out and created a continuing relationship with Texas. Under the assignment it is liable for obligations and expenses related to the interests.  This ownership also allows Republic to 'enjoy . . . the benefits and protection of [Texas laws].'").

        [21] As noted, "[u]nder Texas law, an interest in an oil and gas lease is an interest in the minerals in the ground," and therefore is real property.  *In re Jones*, 77 B.R. at 544-45,

irrelevant and contrary to documents produced by Michigan 4-H that Michigan 4-H did not "seek to obtain previous royalties from the Texas Mineral Interests" during the 2013 lawsuit negotiations because it clearly intended to establish a relationship with Texas when in entered into negotiations with Margaret M. Murdoch in 2007 for Trust assets by assignment upon her death and in the following years consistently litigated alleged ownership rights related those negotiations.  Howell's affidavit does not negate this fact. Moreover during the 2013 settlement negotiations, the Trust specifically informed Michigan 4-H, and thus it knew, that the Trust's cash assets included oil & gas royalty payments to the Trust related to the Dimmit County property that had accumulated during the South Carolina litigation.  #35, Ex. 1, Jan. 29, 2013 correspondence between counsel for the Smith Trust and Michigan 4-H (showing royalty payments to the Smith Trust in December 2012 of $172,554.83 and production tax payments of $53,842.48).

Because Michigan 4-H failed to negate all the bases of personal jurisdiction pled by Anadarko, Anadarko claims the motion for dismissal must be denied.  Alternatively, if the Court finds that Michigan 4-H did negate those bases, Anadarko maintains that it can show that Michigan 4-H purposely availed itself of the Texas forum and that the exercise of jurisdiction comports with

---

citing *Phillips Petroleum Co. v. Adams*, 513 F.2d at 363 ("Texas law provides that oil and gas are realty when in place and personalty when severed from the land by production.").  Anadarko cites the latter case for also holding that unaccrued royalty payments are also deemed to be realty until the oil and gas are severed from the ground.  *Id.*

traditional notions of fair play and substantial justice for the following reasons.

Anadarko asserts that in 2007 representatives of Michigan 4-H met with Margaret Murdoch, then Co-Trustee of the Mary Marshall Smith Trust, in South Carolina, to negotiate for and receive an assignment of the proceeds and corpus of the Smith Trust upon her death.  #35, Ex. 2 Michigan 4-H's Answer to Smith Trust's South Carolina Petition at ¶ 28, admitting to ¶ 28 in Ex. 3, Smith Trust's South Carolina Petition.  At that time Mrs. Murdoch owned many assets, including oil, gas, and mineral interests in Dimmit County, Texas, and understood that the assets she would assign to Michigan 4-H would include Texas mineral interests.  Ex. 4, three-year Oil and Gas Leases signed by Margaret Murdoch as Co-Trustee of Smith Trust on June 30, 2006; Ex. 5, five-year term Oil, Gas, and Mineral Lease, signed on May 19, 1997.  On May 30, 2007 she and Michigan 4-H entered into an Endowment Agreement (copies at #35-2 and #37-2), in which she agreed to distribute the assets of the Trust to Michigan 4-H at the time of her death and Michigan 4-H agreed to accept those assets and their accompanying obligations.

After Margaret Murdoch died in 2009, on May 2, 2011 the Mary Marshall Smith Trust and its Trustee sued Michigan 4-H in a South Carolina court and asked the court to determine whether Michigan 4-H was entitled to the Smith Trust assets under the Endowment Agreement.  The litigation was contentious until Michigan 4-H settled the suit and received the final assignment of the Trust assets, including the Texas mineral interests.  Anadarko

asserts that the period of the litigation corresponds to the time during which the mistaken royalty payments were being made by Anadarko to the Trust.  Anadarko charges that in 2007 Michigan 4-H purposefully availed itself of the Texas forum by entering into the Endowment Agreement to receive assignment of Texas real property (the mineral interests and unaccrued royalty payments) from the Smith Trust).  *Retamco*, 278 S.W. 3d at 339 (in accepting the assignment of real property in Texas, Michigan 4-H created a continuing relationship with the State of Texas and contacts supporting personal jurisdiction in the forum state); *id.* at 340 ("when purchasing real property, the location matters").

In sum, since it entered into the Endowment Agreement in 2007, Michigan 4-H has persistently claimed that the Endowment Agreement contract entitled it to ownership of Texas real property and the proceeds of it after the death of Mrs. Murdoch, negotiated for that real property, and finally received it in the settlement of the South Carolina suit, thereby establishing sufficient contacts to warrant the exercise of personal jurisdiction over Michigan 4-H in Texas.  *Retamco*, 278 S.W. 3d at 339-40.

Furthermore the royalty payments relate to Michigan 4-H's ownership of the Texas real property.  From the time it entered into the Endowment Agreement until the settlement of the South Carolina litigation, Michigan 4-H understood that it was seeking a "benefit, advantage, or profit" from the receipt of that Texas real property, including unaccrued royalty payments for the oil and gas in place, which was still real property  because it

-47-

was unsevered, still in place on the property.[22] *Retamco*, 278 S.W. 3d at 340; *Phillips Petroleum*, 513 F.3d at 363.

Anadarko argues that it erroneously made royalty payments "related to" the Texas mineral interests to which Michigan 4-H claimed right under the Endowment Agreement. Even though final title to the Texas real property did not transfer to Michigan 4-H until 2013, it had claimed such right to the real property sufficiently to support the minimum contact analysis since Margaret Murdoch's death in 2009, throughout the period during which the erroneous payments were made. Thus the forum state has personal jurisdiction over Michigan 4-H.

Therefore, contends Anadarko, all its claims arise out of the same forum contact, i.e., Michigan 4-H's pursuit of and ultimate receipt of the Smith Trust's Texas real property assets.

---

[22] The Endowment Agreement, Ex. 7, at p.1 expressly stated that Michigan 4-H sought "proceeds from" the Smith Trust. Upon severance, the oil became "proceeds" of the real property. Royalty payments are deemed "proceeds" from the oil and gas real property interests. *Commissioner of Internal Revenue v. Wilson*, 76 F.2s 766, 769–70 (5th Cir. 1995). They have a quasi property character after they are severed from the land while held by the Trust. *Moore v. Vines*, 474 S.W. 2d 437, 439 (Tex. 1971)(royalties derived from real property held by a trust are, like real property itself, part of the corpus of the trust because they represent depletion of the real property.) *Whittington v. Whittingon*, 608 So.2d 1274, 1280 (Miss. 1992)("A royalty is payment for minerals withdrawn from the land and represents the principal or corpus. . . . As a general rule, 'a life tenant is entitled only to the interest from any investment of such funds where the lease is executed after the execution of the instrument creation the life estate.'") *citing* 2 Williams and Myers, *Oil and Gas Law* § 512.2, pp. 643–44 (1989)("This view is based on the theory that the royalties are a substituted corpus and must be preserved for the benefit of the owner of the future interest until it becomes possessory.").

As for the second part of the analysis, i.e., whether the exercise of personal jurisdiction over Michigan 4-H offends traditional notions of fair plan and substantial justice, the burden of proof shifts to Michigan 4-H to show that it would be unreasonable here.  Addressing the five factors for consideration in the determination, Michigan 4-H argues that the burden on it to litigate in Texas would be substantial.  Anadarko responds that if it had to bring suit in another state, it would chose South Carolina, which would have personal jurisdiction over all the involved parties, but where the burden on nonresident Michigan 4-H would be no less than it is in Texas.  Furthermore, Michigan 4-H still owns the real property and has received over $500,000 in royalty payments since the beginning of 2014.  It also would have to come to Texas to institute litigation to enforce its Dimmit County property interests, so traditional notions of fair play and justice would not be offended in asking it to bear the burden of litigating in Texas, where it continues to seek the benefits and protection related to its ownership of Texas real property.

In addition, insists Anadarko, the factors favoring personal jurisdiction in Texas outweigh any burden of doing so for Michigan 4-H.  Texas has a substantial interest in protecting Texas resident creditors from any fraudulent transfer of funds to which they have a superior claim.  As noted, Anadarko is a citizen of Texas since its principal place of business is here.  Texas

also has a strong interest in adjudicating matters involving real property within its borders.[23]

Anadarko maintains that it has presented a prima facie case of personal jurisdiction with sufficient contacts in Michigan 4-H's negotiation for, pursuit of, and ultimately assignment of Texas real property and the resulting royalties.  It has also satisfied *International Shoe's* requirement that the exercise of such jurisdiction comport with traditional notions of fair play and substantial justice because of Texas' concern for and protection relating to claims concerning Texas real property,

---

[23] In *Shaffer v. Heitner*, 433 U.S. 186, 207-08 (1977), the Supreme Court wrote,

> "[T]he presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation.  For example, when claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction.  In such cases, the defendant's claim to the property located in the state would normally indicate that he expected to benefit from the Sate's protection of his interest.  The State's strong interests in assuring the marketability of property within its borders and in providing a procedure for peaceful resolution of disputes about the possession of that property would also support jurisdiction, as would the likelihood that important records and witnesses will be found in the State.  The presence of property may also favor jurisdiction in cases such as suits for injury suffered on the land of an absentee owner, where the defendant's ownership of the property is conceded because the cause of action is otherwise related to rights and duties growing out of that ownership.

while the burden of litigating in Texas would be negligible given Michigan 4-H's continuing relationship with the forum based on its real property.  326 U.S. at 316.

As for Anadarko's breach of contract claim, the contracts at issue are the oil and gas leases on the Dimmit County real property signed by the Smith Trust and the division orders mandated in the lease and signed by the Trustee for the Smith Trust, the lessor.  Anadarko's Second Amended Complaint pled that Smith Trust assigned the Texas real property subject to the lease, which mandated the payment of royalties premised on signed division orders, to Michigan 4-H.  The lease governed that property and all of Anadarko's rights and responsibilities were transferred by the Smith Trust to Michigan 4-H, which also became subject to the same obligations upon that assignment.  See Exhibit 10, Oil and Gas Lease (Paid UP) between Anadarko and the Smith Trust, ¶ 3(I) ("Lessee [Anadarko] is unconditionally obligated to Lessor to make the payment of royalties hereunder . . . provided Lessor has executed the State of Texas statutory form division order.").  *See id.* at ¶ 9 ("The rights of either party hereto may be assigned in whole or in part (except that oil rights shall never be severed from gas rights).  The provisions hereof shall extend to the heirs, successors and assigns of the parties hereto, but no change or division in ownership of land, rentals or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of Lessee [Anadarko].").  Anadarko further alleged that it performed under the lease and the division orders when it paid Michigan 4-H royalty payments related

to the Dimmit Count wells and that Michigan 4-H accepted the
tender of royalty payments and cashed royalty checks worth more
that a million dollars, thereby acknowledging the lease and the
division orders.   Finally Anadarko asserts that Michigan 4-H
breached its obligation under the contracts when it refused to
return the erroneous royalty payments to which it had no right and
by which it had damaged Anadarko.   Anadarko contends that it has
satisfied the requirements of Rule 12(b)(6) and the case law
interpreting it.

If the Court finds its pleadings deficient, Anadarko
asks the Court to allow it to amend under Rule 15(a).

### Anadarko's Supplemental Response (#37)

Despite Michigan 4-H's argument to the contrary (Reply,
#36 at p.2), Anadarko claims that it has discovered from its
business records that Michigan 4-H did own the Smith Tract during
the period when the erroneous royalty payments relating to that
property were made and that ownership of the Smith Tract supports
the exercise of personal jurisdiction over Michigan 4-H for claims
relating to that property.   The Settlement Agreement that ended
the South Carolina litigation was effective December 13, 2013.   #
35-9, Ex. 9, ¶ 18; #37, Ex. 1, Dec. 23, 2013 Court order approving
settlement.   Before the court approved the settlement, on December
20, 2013 the Trust quitclaimed their Texas mineral interests to
Michigan 4-H.   #35, Ex. 8, Quitclaim Deeds to Michigan 4-H.
Therefore, as of either December 20 or 23, 2012, Michigan 4-H was
the owner of all right, title, and interest in the Texas property
at issue.   #35, Ex. 8.

Anadarko made over $34,000 in mistaken royalty checks related to the Texas mineral interests just acquired by Michigan 4-H. Anadarko identifies each check, its date, the total royalty, the mistaken royalty portion (for wells on the Ranch),[24] and the exhibit number (2, 3, 4, and 5). #37, pp. 3-4. All the checks were cashed; none was voided or returned to Anadarko. #37, Ex. 6. After Anadarko was informed in February 2014 that Michigan 4-H now owned the Texas mineral interests, Anadarko made correct payments directly to Michigan 4-H and adjusted credits and debits to its account for the oil and gas produced before it owned the property. Since it became the owner, Michigan 4-H has received and accepted $16,664.79 in net royalties for the period from August 1, 2012 through November 30, 3013, for the period before it owned the property. Anadarko submits a chart summarizing its adjustment of credits and debits for oil and gas produced before Michigan 4-H became the owner of the mineral interests in Texas. #37 at pp. 5-6.

Thus according to Anadarko it is clear that Michigan 4-H's ownership of real property in Texas establishes a continuing relationship with Texas, that it was the owner when Anadarko made some of the erroneous payments, and it is proper for Texas to exercise personal jurisdiction over Michigan 4-H. *Retamco*, 278 S.W. 3d at 339-40.

---

[24] Anadarko explains that the four checks that included the erroneous payments were made out to the Trusts because at that time no one had told Anadarko of the transfer of ownership.

Furthermore, Michigan 4-H received direct royalty payments from Anadarko and cashed them before it owned the Texas property.   Exercising personal jurisdiction over a party is permissible when that party availed itself of the protections and benefits of the forum. *Burger King*, 471 U.S. at 476-78.

### Michigan 4-H's Reply to #37

Michigan 4-H insists Anadarko has not given and does not have a meritorious answer to the jurisdictional issue here, including in its Supplemental Response:  "From what purposeful Texas contact by Michigan 4-H does Anadarko's claim against Michigan 4-H arise?"  The two allegedly erroneous payments that Anadarko identifies in its Supplemental Response, like the others at issue in this case, were made to the Trusts, not to Michigan 4-H.  So now Anadarko is trying to recover from Michigan 4-H money it paid to the Trusts, not to Michigan 4-H.  Thus the basis for specific personal jurisdiction cannot and does not arise from Anadarko's payment of money from Texas to Michigan 4-H, which did not occur.

Furthermore the December 2013 payments relate to property that Michigan 4-H does not own and never owned. (#25, p. 7, ¶¶ 16 and 18:  "Anadarko mistakenly paid the Beneficiary Trusts royalty payments for wells located on the Ranch . . . . Wells Fargo, as Trustee[,] . . . retained the funds despite the fact that the Trusts did not have title to any mineral interest in the Ranch and were not entitled to the proceeds of any production from the Ranch.").  Specific personal jurisdiction as to Michigan 4-H does not arise from payments made to some other party on property

Michigan 4-H did not own and has never owned. *Retamco*, 278 S.W. 3d at 339 (for "purposeful availment" only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person); *Mullins v. TestAmerica, Inc.*, 564 S.W. 3d 333, 339 (Tex. 2009)(explaining that, in the absence of knowledge by that transferee of the transferor's scheme to defraud, the Fifth Circuit is "doubtful that personal jurisdiction exists over the recipient of a fraudulent transfer anywhere a complaining creditor files suit simply by virtue of the creditor's residence in that forum.").

Anadarko's debiting or crediting of Michigan 4-H's account for pre-ownership time periods does not change the analysis. Not only does Anadarko fail to cite any authority for its theory of retroactive acceptance of benefits, but it does not claim these to be mistaken royalty payments and Anadarko's claims do not arise from those payments. *Moki Mac River Expeditions v. Drugg*, 221 S.W. 3d 569, 579 (Tex. 2007)(the "arise from or relate to" requirement defines the key required nexus among the nonresident, defendant, the litigation, and the forum). Michigan 4-H insists that the 2014 and 2015 payments have no relation to any of Anadarko's claims in this suit; they arise out of the South Carolina settlement with the foreign Trust Defendants. Thus these claims should be dismissed for lack of personal jurisdiction.

## Court's Decision

Which state's law applies to a lawsuit is usually a question of law. *Minnesota Mining and Mfg. Co. v. Nishika Ltd.*, 955 S.W. 2d 853, 856 (Tex. 1996). In contract disputes, choice of

law issues are determined by which state has the most significant
relationship to the transaction and the parties by considering the
following:  the place of contracting; the place of negotiation;
the place of performance; the location of the contract's subject
matter; and the parties' domicile, residence, nationality, place
of incorporation, and place of business.  *Minnesota Mining and
Mfg. Co. v. Nishika Ltd.*, 953 S.W. 733, 735 (Tex. 1997).

      In this case there is disagreement about which contract
with whom is controlling what and why, all of which are relevant,
as will be discussed.  The division orders on which Anadarko
relies do not contain a choice-of law provision, nor have the
parties claimed any relevant statute controls, so the Court must
determine which state has the most significant relationship to the
issue presented.  *Reddy Ice Corp. v. Travelers Lloyds Ins. Co.*,
145 S.W. 3d 337, (Tex. App.--Houston [14[th] Dist.] 2004, rev.
denied), *citing Maxus Exploration Co. v. Moran Bros., Inc.*, 817
S.W. 2d 50, 53 (Tex. 1991), and *Restatement (Second) of Conflicts
of Laws* §§ 6 ("A court, subject to constitutional restrictions,
will follow a statutory directive of its own state on choice of
law.") and 8 (not relevant here); *Grant Thornton LP v. Sun trust
Bank*, 133 S.W. 3d 342, 358 (Tex. App.-Dallas 2004, pet.
denied)("In determining choice-of-law issues, Texas courts apply
the most-significant relationship test as set out in the
Restatement (Second) of Conflict of laws.  The general test is set
out in section 6 of the Restatement.").

      The subject matter in this case is the royalty payments
and the mineral interests in two Texas real properties, the Smith

Tract and the Ranch, and the place of performance is Texas. Plaintiff Anadarko's principal place of business is in Texas and it has chosen to sue in Texas.  Furthermore Anadarko has made a persuasive argument that Texas law applies to the transfers to the Foundations because the transfers are connected to title to mineral interests in Texas and to division orders that are Texas contracts that establish the obligation to repay Anadarko, a Texas resident, with performance occurring in Texas.  The Court agrees and concludes that Texas law governs this action.  The Court would further point out that Michigan H-4 addresses the issue only under Texas law.

The Court agrees with Michigan 4-H that the Court lacks specific personal jurisdiction over Michigan 4-H.  There is no specific personal jurisdiction over Michigan 4-H unless its liability arises from or relates to its minimum contacts with the forum state.  Anadarko has conflated and obscured both the two discrete Texas real properties, the Smith Tract in which the Trusts and, ultimately by assignment and settlement of the South Carolina litigation, Michigan 4-H hold property interests, and the Ranch, in which they never owned an interest, as well as the royalty payments from both, thereby confusing the question of Michigan 4-H's minimum contacts with Texas.  Once these are distinguished, Anadarko's arguments[25] are irrelevant to the

---

[25] That "the purchase and ownership of real property [in Texas] could 'involve[] many contacts over along period of time,' which would carry with it certain continuing obligations": *e.g.*, valuation and tax issues, and potential expenses of maintaining their interest" and that if Republic decides to enforce rights in its interests in the oil and gas leases and wells, it must

jurisdiction issue because Michigan 4-H's alleged minimum contacts do not relate to the property giving rise to the erroneous payments, i.e., the Ranch. *Retamco*, 278 S.W. 3d at 340. Not only did the Mary Marshal Smith Trust, the Beneficiary Trusts, and, subsequently, the Pete and Sally Smith Foundation never own mineral interests in the Ranch, but the division orders, the contracts in dispute which Michigan 4-H never signed and was in no way a party to, were between Anadarko and the unrelated third-party owners of the oil and gas wells and leases on the Ranch and related to the royalties derived from those properties on the Ranch.  The royalty payments at issue were generated from those mineral interests in the Ranch.   That Anadarko erroneously made some of those payments to the Trustee and the Trusts does not establish minimum contacts with Texas by any of the Defendants in this action because they did not own the Ranch property.  Any minimum contacts with Texas that Michigan 4-H established when it pursued and obtained the Smith Tract's interests, which the Trusts and part of which ultimately Michigan 4-H did own, did not give rise to the claims in this suit to recover the royalties owed to third-party owners of the mineral interests in the Ranch.  Indeed, that Anadarko erroneously sent the royalty payments governed by the division orders to Wells Fargo as Trustee of the Beneficiary Funds in no way involved Michigan 4-H.

Moreover even Michigan 4-H's link to the funds constituting a small portion of these mistaken payments that it

necessarily do so in Texas.

received pursuant to the settlement is far too attenuated to serve as a purposeful minimum contact with Texas.  Not only did Anadarko not make erroneous payments Michigan 4-H's status, but Michigan 4-H received the small portion of them not based on ownership of the Texas Ranch or the division orders governing distribution of the royalties of the oil and gas wells and leases on the Ranch, but pursuant to a settlement of a lawsuit in South Carolina over Michigan's alleged status as an assignee of Margaret Murdoch, a South Carolina resident, pursuant to the Endowment Agreement between Murdoch and Michigan 4-H.

Because Anadarko fails to establish that Michigan 4-H has minimum contacts with Texas, this Court does not address whether the exercise of personal jurisdiction over Michigan 4-H would offend traditional notions of fair play and substantial justice. *Renoir*, 230 Fed. Appx. at 360)

For the reasons stated, the Court

ORDERS that Michigan 4-H's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(1)(#30) is GRANTED without prejudice to Anadarko's right to sue Michigan 4-H where Michigan H-4 would be subject to the court's jurisdiction.  Because the Court lacks jurisdiction to rule on the merits of Michigan 4-H's motion to dismiss the breach of contract claim under Rule

**SIGNED** at Houston, Texas, this  12th  day of  August ,
2016.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE